OK, now that everybody's settled, our next case for argument is Ctr. for Biological Diversity v. Zinke and Intervenor Hill Corp., Alaska, LLC. Good morning. May it please the court, I'm Rebecca Noblin, and I represent petitioners. With me at council's table are Jeremy Lieb and Kristen Monselle. And I will attempt to reserve three minutes for rebuttal this morning. In our briefing, we showed how the Bureau of Ocean Energy Management failed to comply with the National Environmental Policy Act, and how both the Bureau and the Fish and Wildlife Service failed to comply with the Endangered Species Act. This morning, I'd like to highlight a few key points from our arguments, starting with our NEPA climate change argument, and then moving on to our Endangered Species Act polar bear arguments. First, the unlawful incidental take statement, and then the unlawful biological opinion. The crux of our climate argument is that when the Bureau looked at the emissions of the substitute energy sources under the no-action alternative, it knowingly omitted the well-known and predictable effects on the market of removing these substitute sources. And this omission produced skewed and misleading results. This isn't a disagreement about methodologies. The Bureau is free to choose any rational path to assessing greenhouse gas emissions. What it isn't free to do is to knowingly omit critical information, and in so doing, underrepresent the environmental effects of this action. The court should reject the Bureau's irrational analysis for the same reason multiple courts have rejected similar greenhouse gas analyses based on the theory of perfect substitution. It's illogical, and it places the agency's thumb on the scale by inflating the benefits of the action while minimizing its impacts. As the Tenth Circuit held in Wild Earth Guardians versus the Bureau of Land Management, the fundamental problem with perfect substitution is that it ignores how the energy market responds to decreased supply, and that willful ignorance predictably leads to an underrepresentation of the climate cost of a project. That's the exact problem with the Bureau's analysis here. It knowingly ignores the fact that adding oil to the global market lowers cost and raises demand, and removing oil from the market raises cost and lowers demand. Because of these market forces, the Bureau's own prior analysis, as well as other analyses in the record, have shown that for every barrel of oil left in the ground, only about half a barrel takes its place. The Bureau asserts that it omitted this critical information because it's too hard to calculate the foregone emissions of that half barrel that's not produced. Whether that's true or not is not a legitimate reason to hide the fact that the emissions of the new action alternative are likely substantially lower than what this EIS says. We're not asking the court to tell the Bureau how to do its job. We're asking the court to hold that the Bureau committed this. If we agreed with your analysis or your arguments, what would be the effect of that? What would the, are you asking what the Bureau should do? Right. What should the Bureau do? I mean, that's essentially what you're arguing. Yeah, I think you have a position that the Bureau should have followed, and you want us to tell the Bureau this is what you have to do. So what is it that you're looking for? Your Honor, our argument is what they did was irrational. I think they have a lot of options. And to be clear, we're not asserting that there's any particular way they should have done it. But for example, there are multiple models, including their own model, that show that only about half a barrel of oil replaces every barrel left in the ground. If the Bureau disclosed that fact and acknowledged that it's too hard to calculate the emissions of that half barrel, that would be reasonable. That would show, that would explain as much as they can explain it wouldn't underrepresent the environmental effects of the action. Another option would be to just show gross emissions, just to calculate the downstream emissions of the action alternative, and compare it to the zero emissions of the no action alternative. And maybe they could add an explanation that market forces. So tell me again, why is it irrational for them to do the analysis that they did? What they've done here is omit a critical factor from their analysis that would substantially change the outcome. And in omitting the effects on the foreign market, it overstates the emissions of the no action alternative and underrepresents the environmental effects of the action. As in the perfect substitution. They basically say, to do what you're asking them to do would require them to look at every country and to figure out some sort of model that would incorporate basically every country. And they say, we're asked to do reasonable predictions, but that's unreasonable. What's wrong with that? This is all very complicated. It doesn't have to be complicated. I think they could, as I said, they could compare gross emissions. That would be a fair comparison. The no action alternative results in zero emissions. Or if they want to talk about, if they want to model emissions, they can disclose that half a barrel, that for every barrel of oil left in the ground, only half a barrel takes its place. It's OK to say, we don't know what the emissions of that half a barrel would be because it's too complicated to model that. But they need to disclose it. Here, when they omit the effects on the foreign market, it makes it look like almost all of the oil would be replaced. And that's simply not the case. And their own model shows that. From the no action alternative. The no action alternative. Counsel, is it fair to say that, as the Tenth Circuit noted in the Wild Earth Guardians case, that the Bureau kind of strayed from its core area of expertise and went into another area, market analysis, that is not part of the scientific core of analysis that normally accompanies an environmental impact statement? I think that's why this is so complicated. Yes, Your Honor, the Tenth Circuit did say in Wild Earth Guardians that it's questionable whether economic modeling was in the Bureau of Land Management's area of expertise. And the same is true here. It's certainly questionable whether economic modeling is within the Bureau's area of expertise. I don't think anyone would have faulted the Bureau for giving a more qualitative explanation of market forces and explaining that the greenhouse gas emissions of the no action alternative are zero. But because of market forces, about half of what's left in the ground would be replaced. Because even the D.C. Circuit said the outcome is counterintuitive with the market forces analysis that was done in this arena. Yeah. So that's a little troubling to me. The fact that the D.C. Circuit that accepted this model even said that it's counterintuitive, coupled with the fact that this is outside the general area of expertise for the Bureau, makes me wonder how much deference should be given to that determination. Are you referring to the Sierra Club versus Department of Energy case? The D.C. Circuit case that the government cited. I can't remember the, I think it's Sierra Club. In that case, it's a different sort of analysis that the plaintiffs were looking for in that case. In that case, the plaintiffs were asking the agency to do some additional calculations. Here, the agency has chosen to model net emissions and has chosen to rely on an assumption that defies basic economic principles. Here, we're looking at a decision that was irrational. And it skews the environmental effects – skews the analysis of environmental effects. And so, in that sense, it's more like the perfect substitution cases. This Court has held that this is the type of inaccurate economic information that may defeat the purpose of an EIS by impairing the agency's consideration of the adverse environmental effects and by skewing the public's evaluation of the proposed agency action. Before talking about our specific Endangered Species Act claims, I'd like to take a minute to put the Fish and Wildlife Service's errors in context. The fundamental problem with the service's biological opinion for polar bears is that it attempts to satisfy the Endangered Species Act's requirements with a Marine Mammal Protection Act analysis. Now, from a legal perspective, that's not okay. The two statutes have different processes and requirements. The piece that I'd like to amplify here is – Oh, there's – well, no. What's wrong with the agency saying, because the Marine Mammal Protection Act will prohibit any harm to the polar bear, if we can wait to see what that analysis will yield before we do our – we confirm or firm up our incidental take statement? What's wrong with that? There are several things wrong with that. One is that it's – at a basic level, it's unlawful. The Endangered Species Act has a separate requirement to ensure that the action doesn't jeopardize the species or adversely modify its habitat. And the Polar Bear 4D Rule, which sort of explains how the Marine Mammal Protection Act and the Endangered Species Act interact, specifically says that nothing in this 4D rule interferes with a service's obligation to consult under Section 7 of the Endangered Species Act and complete a biological opinion and estimate incidental take-through and incidental take statement. That incidental take – They say they did that. What's that? They say they did that. They did issue a biological opinion and an incidental take statement. Neither the biological opinion or the incidental take statement complies with the law. The incidental take statement is missing an estimation of takes by harassment. And the biological opinion relies for its no jeopardy decision and no adverse modification decision on mitigation measures that it says are going to be applied under the Marine Mammal Protection Act but that are not yet in place. So the definition of harass was, you think, not as stringent as the legal definition of harass because I think in the opinion it said harass meant to injure or severely harm or disturb, something like that. So you take issue with the definition of harass that was in the opinion? Absolutely. In the opinion – we take issue with the definition of harass that council has put forward in its briefing. That doesn't appear in the biological opinion itself. The biological opinion is silent as to takes by harassment. I would like to really focus the court's attention on the novel and surprising argument that the government is making here regarding what constitutes take by harassment under the Endangered Species Act. In defense of the service's failure to estimate takes by harassment in the so that it can argue that over the 25-year life of this project, there won't be a single take by harassment. The definition of harassment that council is proposing is a radical change in how the ESA has historically been interpreted and applied, and it would essentially write harassment out of the definition of take. According to the government, harassment by a behavioral disturbance is only legally cognizable under the ESA if the service affirmatively finds that it will immediately endure a polar bear. And the problem with that is that it bumps up against the plain language of the Endangered Species Act. The Endangered Species Act defines take broadly, and it includes the terms harm and kill as well as the term harassment. In Babbitt v. Sweet Home, the Supreme Court confirmed, the Congress meant for each term defining take to serve a particular function consistent with but distinct from the functions of the other verbs defining take. And more than 30 years ago, this court in Palila affirmed that the distinct meaning of the harassment form of taking includes activities that are remote from actual injury, such as bird watching. The government's argument that harassment has to cause immediate and obvious harm to a polar bear to be cognizable take deprives the word harassment of any Supreme Court and Ninth Circuit precedent. To be clear, significant disruption of polar bear behavior is likely to lead to injury. It's just that the injury might not be immediate or obvious. That's why the best way to read the service's regulations, and the only way to read them consistent with the statute and with the circuit's precedent, is to mean that a significant disruption of behavioral patterns itself indicates harassment under the Endangered Species Act. Because Congress determined that that disruption is likely to lead to injury over time. This gives harassment the independent meaning that the government's novel reading denies. It also matches the service's own longstanding interpretation of its own regulations. For example, the service's polar bear 4D rule, which we were just talking about, describes incidental take caused by noise, lights, visual disturbance, and emissions of toxins. Looking at the incidental take statement with a proper definition. Well, maybe you're going to just address it. You just argued that their definition or their use of the term harassment, the government argued in its brief to us, is inconsistent with our case law and other case laws and the RICs. What was the definition used in the biological statement? There is no definition of harassment in the biological opinion. The biological opinion is silent about it. It describes behavioral disturbance that is harassment under the Endangered Species Act, but when it gets to the incidental take statement. But if we agree with you, if I were to agree with you, that the government's argument is misplaced, is off base, what does that lead to? What's the conclusion that one would draw from that? The conclusion is that their incidental take statement is unlawful because it doesn't contain any estimate of takes by harassment. So that would mean the biological opinion would be negated or would have to go back to be amended? That's right, yeah. If you agree with us that the incidental take statement is missing an estimate of takes by harassment, and nobody, none of the briefs just have argued that the biological opinion doesn't describe significant behavioral disturbances such as disturbance to polar bear denning. And nobody has argued that, or sorry, the government hasn't argued that it has provided any sort of surrogate to provide a trigger for reinitiating consultation. So if you agree with us that the incidental take statement is missing this estimate of take, then we would ask that you vacate the biological opinion in incidental take statement. And because they are part of the agency's decision to approve the Liberty Project, vacate the record of decision in the Liberty Project as well. Counsel, going back to the greenhouse gas, the D.C. Circuit case that the government was relying on was Center for Sustainable Economy v. Juul. That was the case. So why don't you think that case supports the model that was used in this case? My recollection of Center for Sustainable Economy v. Juul was that the, it was not about any sort of greenhouse gas analysis. It was about whether the agency had to look at specific localized effects of producing substitute energy. For example, localized air pollution or oil spills. And in that case, the D.C. Circuit affirmed the agency's decision not to look at specific localized effects. It wasn't related to greenhouse gas emissions. And then there was no issue in that case of the agency applying an irrational assumption that that infected its analysis. So just now to swing back to the polar bears and the relationship between the ESA and the Marine Mammal Protection Act. So one of the arguments that the government made was that in the biological opinion, they could just say that whatever comes out through the MMPA analysis, I guess it has public notice and comment and a reg for the five-year period and whatnot, that those will automatically apply to the biological opinion. What's wrong with that? What's wrong with that is the service hasn't assessed whether whatever that is actually meets the standards of the Endangered Species Act. Well, they say, well, the MMPA requires greater protection. Yeah, that's what they say. The difference I think that's relevant here, or what the ESA provides that the MMPA doesn't provide, is the ESA requires the service to take a step back and look at the big picture. The Endangered Species Act requires the service to look at the Liberty Project over the 25-year life of the project and all the other things that might affect polar bears over those 25 years. Under the MMPA, the service looks at impacts in five-year increments. And it only looks at the impacts of the specific project. So while the standard under the MMPA is negligible impacts, individually minor impacts over the course of more than two decades and multiple projects and climate change could lead to jeopardy or adverse modification. I understand from reading the briefs a little bit that there were other projects in the area. Is that right? Not on the outer continental shelf, but there were other similar kind of oil drilling. Did there historically have been similar projects? There's an island in state lands, yeah. Yes. And would have been the – there must have been the environmental analysis of those projects as well and their impact on the polar bears and whatnot. But what … What historically have been the impacts from those projects? Is that the question? Yeah. Yeah, I don't – I don't believe that's in the record. What I would say is that, because polar bears are declining so rapidly because of climate change, historically, you know, historical information on impacts to polar bears is only of limited significance in determining the impacts to polar bears now and over the next 25 years. Is this the only project that's contemplated for right now? There are multiple – I mean, there are multiple projects in the habitat of this particular population of polar bears. There's drilling in the Arctic National Wildlife Refuge. Multiple projects in the National Petroleum Reserve. Other offshore oil development. All of these developments are projected to go online over the life of the Liberty Project. Can I ask one question at a time? Sure. Go ahead. As a procedural matter, how would it work if the Endangered Species Act analysis is deferred until the MMPA is triggered? As a procedural matter, how would that work? When you have a case such as this one where the MMPA comes after – comes sort of at a later time? Right. And if the government is saying, we're going to put our Endangered Species Act analysis on hold pending the Marine Mammal Protection Act, how does that work as a matter of procedure? And at what point would interested parties like your client be able to comment on the Endangered Species Act part of it? If we approve it at this point, do you get a chance to go back later on and say, now we are challenging the Endangered Species Act opinion? How would that all work procedurally? So the Endangered Species – the biological opinion and incidental take statement are final agency actions. Even though they don't go into effect yet, they will go into effect automatically when the MMPA authorization issues. So you wouldn't have an opportunity to – They're challengeable now. And because of the sort of jurisdictional strangeness of this case, we had to bring it under the OCSLA jurisdictional provisions, which required us to bring it in this court within 60 days. If we had to wait for that Marine Mammal Protection Act analysis to come out to assert our ESA claims, we wouldn't be able to bring our ESA claims at that point. The status of the MMPA process? So there – the Fish and Wildlife Service typically does five-year incidental take regulations. There's one that's in effect right now that expires in 2021. And so then the – Project? It's for the Beaufort Sea generally. And there's no specific letter of authorization for this project. And I'm not aware of what the timeline is for the MMPA authorization for this project. So at this point, we don't know what sorts of, you know, mitigation measures and restrictions they will apply to the … Notice the proposed rulemaking, and we're thinking about doing this, this, and this. No. Okay. I'll give you some time for rebuttal. Okay. Thank you. We'll hear from the government. Good morning, Your Honors. My name is James Masonette. I'll be arguing today on behalf of the federal defendants. Also with me at council's table is Sven Brand-Eriksson, who is representing Operator Hillcorp. I'll start with the petitioner's NEPA claim, since that's where they started. There is a body of precedent, Your Honors, that tells agencies how they're supposed to look at greenhouse gas emissions during the environmental impact statement process, during the NEPA process. And those – that precedent has set a goal line, right? It says two basic things. You've got to look at the downstream emissions of the project that you're working on, and BOEM did that here. It accounted for every drop of oil that will be produced by the Liberty Project and the greenhouse gas emissions from that. That body of precedent also says you can't use this theory that's called perfect market substitution. Some agencies in the past had assumed that, well, whether we build a project or not, the same amount of oil will be consumed, so we don't need to even think about greenhouse gas emissions. The courts have rejected that. BOEM didn't do that here. BOEM took these messages, this body of precedent, seriously, and it's worked hard to grapple with how greenhouse gas emissions are analyzed during the NEPA process. And I have to say it's a little frustrating to hear the courts say, well, maybe this isn't your area of expertise, maybe you shouldn't be doing this at all, maybe you shouldn't be engaging in forecasting. Which case in that body of precedent sanctioned the approach that was used in this case? What the body of law says is that we – Which – what is your best case to support the proposition that the economic model you used in this case was appropriate? Well, it's the D.C. Circuit cases. It's Sierra Club versus Department of Energy, 867, 83rd, 189. Okay. You don't have anything from this circuit, correct? I don't have a case that addresses it because agencies have been rushing to catch up here. They've seen this goal line set by the courts. So let me tell you what BOEM did. This is not a model that BOEM built for this project. And BOEM's core expertise does include economic issues. BOEM isn't an environmental agency per se. BOEM is the Bureau of Ocean Energy Management. Its job is to work through the process under OCSLA to develop leasing and projects on the outer continental shelf to develop domestic oil and gas resources. Economics is a big part of that. So part of that OCSLA process is a five-year plan. That's not what we're dealing with here today, but it's a five-year plan for all leasing and activities on the outer continental shelf. And so BOEM, when they saw this body of precedent, they brought a team of economists together to build a model that wouldn't use perfect market substitution. So were those economists already employed by the Bureau? Yes. BOEM already has teams of economists because that's part of its core mission. And so they built this model so they could look at the total effects of the entire five-year leasing program on greenhouse gas emissions. And they built a sophisticated and nuanced model that would avoid the errors of the past, that would avoid perfect market substitution, and would instead say, all right, if we build this project, what will happen to the U.S. energy economy? Counsel, in your view, what's the purpose of analyzing the no-action alternative? Well, I mean, the purpose is to inform the public and the agency so we can have good decisions about what the effects here are on climate change. I don't think it was – it may be counterintuitive, but it doesn't mean that it's irrational to think that if we don't develop domestic oil and gas resources in this country and we choose instead to rely on foreign imported oil, we can't stick our head in the sand and say, well, that has no environmental effects. That's overseas. Don't worry about it. Before you get to the foreign oil issue, so my understanding is you did the downstream and upstream analysis, right? Yes. And then when you got to the no-action alternative, you did this market analysis. So – And then you compare this one method with the market analysis. So there's two separate analyses. And how can – is that – Right. This is their apples to oranges claim, right? Yes. And what's wrong with that? I mean, when I read it, I said, well, yeah, you know, here we have a market analysis and here we have a more traditional analysis. They're not really the same thing, but maybe they are. There are two totally distinct analyses in the environmental impact statement. The first is what you might call a gross emissions analysis. It's just the raw number. If we burn all – if the Liberty Project produces 120 million – million, sorry – barrels of oil, how much carbon dioxide or equivalents is that going to release? That's the gross analysis. There's a chart there. The agency used that to look at the different action alternatives. They didn't include the no-action alternative on that chart. That number would, as opposing counsels noted, have been at zero. They did acknowledge, of course, that the no-action alternative would have no – no carbon – no gross carbon dioxide emissions. Then in a separate analysis, the lifecycle analysis, they used the same tool, this market sim model that they developed for other purposes, to look at – to compare. It's a comparative model. It tells us what's the difference in greenhouse gas emissions using this lifecycle, using – looking at the whole U.S. energy economy between developing the Liberty Project and not developing the Liberty Project. So it's a difference. And so that method is necessarily an apples-to-apples comparison because they're looking at what our emissions will look like, what U.S. emissions will look like with or without the project. So we're not – we're not trying to cross the two methods. Look, so, you know, in their briefs, the petitioner's argument was, well, you didn't go far enough. I mean, again, what's frustrating here is we've got goal lines. The agency has tried to hit the goal and go beyond it by developing this model. In that analysis that you just articulated, you didn't include the impacts of foreign consumption. Well, so let's be clear, every drop of oil that comes out of the Liberty Project is included in the greenhouse gas emissions estimated here. What we didn't look at is how the Liberty Project will send – affect very subtly prices of oil all around the world and then how that will affect greenhouse gas emissions abroad. Now, to figure that out is a task that BOEM and its trained economists concluded was just not feasible because you've got to know, all right, well, if these countries were going to buy more oil because the Liberty Project comes online and the price of oil on the global market drops infinitesimally and they buy a little more oil, what were they going to use that oil for? Because it has different carbon dioxide impacts. On the other hand, if the project isn't built, the price stays infinitesimally higher, they don't buy quite as much oil, but they're still going to get energy. They're going to turn to other sources of energy. And a consumer in China might get their energy from coal. Well, that's going to be a net increase in greenhouse gas emissions. A consumer in France might get their power from nuclear power. That might be a net decrease. You have to look at each and every country in the world. You have to know in economics terms what are the market substitutions for this energy and what's the carbon intensity of those market substitutions. We just don't have that information. So, I mean, there's a goal line. Boom, tried to hit it. It tried to go past it and be thorough, and now we hear, well, you either went too far or you should move the goal line even further out. You have to figure out how the whole global energy economy will react. No agency... Did you include foreign sources of oil for what other users in the United States would consume? Right. So you dipped your toe into the foreign market for purposes of determining what consumers here would use, but you felt like it wasn't feasible to do that across the board. So the petitioners are right. BOEM's model is nuanced enough, and it plugs in the global oil market, as you pointed out, Your Honor, so that we can generate an estimate of how this would affect consumption on the foreign oil market. We can generate an estimate of the marginal reduction in foreign consumption. The problem isn't that. The problem is how do you convert that into greenhouse gas emissions? To do that, you've got to know how those people use energy. So you're saying that you know how people use energy domestically, but you don't know how they use it outside the United States. That's right. So that's your explanation for why that part of the equation wasn't plugged in. That's exactly right, Your Honor. There have been no studies in all these years now that we've been focusing on greenhouse. Well, the petitioners have submitted some studies, right, and I think those studies illustrate the kinds of problems that this kind of analysis raises. I mean, you look at the Bordhoff-Hauser study they've cited, for example. These studies, none of them involve detailed economic models. They just involve sort of some basic assumptions about how this might work. They all involve much larger quantities of oil. It's much easier to figure out how greenhouse gases might fluctuate. Big changes in oil prices. So if you look at the Bordhoff-Hauser study, they said if you eliminate all restrictions on U.S. oil exports, it's either going to reduce global greenhouse emissions by 57 million tons, or it's going to increase it by 168 million tons, or somewhere in between. So, I mean, the point, Your Honor, is that the agency, NEPA doesn't require the agency to guess. NEPA requires the agency to take a hard look at things. It allows it to limit its analysis based on practical considerations of feasibility. BOEM here did what we thought we had to do, what the precedent says we had to do. We had to take a hard look at greenhouse gas emissions. We looked at all the downstream emissions. We looked at how this project will affect the U.S. energy market. Importantly, we acknowledged that this project will affect the global energy market. We didn't ignore it. We didn't try to sweep it under the rug. It's directly in the response to comments. What did you say? It wasn't very much. They said we acknowledge that this effect will occur, and we don't believe it's feasible to calculate how large the change in greenhouse gas emissions would be. As far as I know, Your Honor, no agency has ever undertaken the analysis that they're asking for here today. No court's ever required it. The D.C. Circuit rejected it. The important thing, the standard for the court is did BOEM take a hard look? BOEM did. It avoided the pitfalls of previous cases under NEPA and greenhouse gas emissions. They say we have a lot of options, that it doesn't have to be complicated. The options that aren't complicated give us nothing more than a guess, which their own studies illustrate. NEPA's not about guessing. It's about informed decision-making. All right. Turning now to their ESA claims, I think there are five basic points I'd like to make, Your Honor. First, this project and its effects on the polar bear are extraordinarily small. It occupies 26 acres out of 3,600,000 acres of polar bear habitat. The effects of the project are not likely to extend more than a mile. Most of those effects will be limited to the first two years of construction. Nothing in the record suggests that this project is going to have a significant effect on polar bears, either individually or as a species. Second, the federal government has a long track record of success in carefully managing the effects of the oil and gas industry on the polar bear. This isn't the first oil project on the North Pole. That's what I was asking earlier. Yeah. This is not the first project in the Beaufort Sea. This isn't the first artificial gravel island. It isn't the first project like this. This is the seventh project like this. It just happens to be the first one in federal waters. BOEM and the U.S. Fish and Wildlife Service understand the kinds of mitigation measures we need to protect the polar bear. How do you know if you are waiting for the NMPA mitigation study before you've finalized your project? Because we've been doing this for 30 years, Your Honor, because we have a detailed process, because we have – Well, why don't you have a mitigation plan in this – You have so much experience. Why don't you just put it in the – in the bylaws? Well, I mean, that's part of the complexity here, Your Honor. We're not sitting in just an ESA case. We're in a case that sits at the intersection of the ESA and the NMPA and the polar bear's core deal. But you have to comply with the ESA. Right. They do, but the ESA doesn't let them write an incidental take statement until they have NMPA take authorization. Congress specifically amended the Act. Congress wanted the statute to work like this, and it's in the text of the ESA. So we do have some mitigation. But the problem is that the – as opposing counsel pointed out, the ESA says that the action becomes final, and then if you wait until the NMPA process is completed, the opportunity to challenge the – under the Endangered Species Act is lost. So how is that conundrum to be resolved? I mean, we're not at the end of the process. You know, there will be a further action under the NMPA. There will be the incidental take authorization through a letter of authorization, further ESA process, and they can challenge that. But look, I mean, this Court has upheld biological opinions that look just like this before. You did that in CBD v. Salazar. That biological opinion did the same thing. When it came to reasonable and prudent measures, it says we incorporate by reference here the mitigation measures from the NMPA take process and from the future letters of authorization. But had the NMPA – Go ahead. No, I'm sorry. Were the NMPA mitigation measures extant at that point? Yes. And they're extant now because you can see – first of all, some of these are already incorporated into the proposed action here. They're already part of this biological opinion and enforceable under the ESA right now. And you can see those in the biological opinion at one excerpt of Record 40 because they were part of what Hillcourt proposed. And they're part of their OCSLA permits. They have to do it. You can see the kind – so there's an NMPA incidental take regulation, an overarching regulation, and a biological opinion on that that looks at all oil and gas activities in the Beaufort Sea and the adjacent areas of Alaska, including this Liberty project, right? That has a suite of mitigation measures that will be required here in the letter of authorization. You can see those in the Record. They're the supplemental excerpts of Record. You're talking very fast, counsel, but I have a question to ask you. What's your response to opposing counsel's observation that the Endangered Species Act looks at a broader range of activity over a more expansive number of years as opposed to the NMPA regulations that look at five-year increments? And at this point in time, the one that's in effect expires in 2021, and we don't know when the next set of regulations – Right. That's exactly wrong, Your Honor. The NMPA is more protective. Why? Because an ESA – But what about the precise question about the Endangered Species Act covering a wider swath of activities in terms of years? Do you disagree with that? Yes. I disagree with it very much so, yes. I mean, the point of the NMPA being redone every five years is that we have to look at it again every five years. Under the ESA, an incidental take statement could continue in perpetuity. The NMPA is more protective that way. It looks at – Well, it's a matter of perspective because the Endangered Species Act is looking at the cumulative impacts over a longer period of time, whereas the regulations are looking five years at a time, which is more of a snapshot than the Endangered Species Act. That's so – you don't – you disagree with that? Yes, Your Honor. I disagree that that restricts the analysis of the NMPA and makes it less restrictive. I mean, this is – the service went through all the reasons why, the NMPA analysis, for this issue, including specifically for harassment, and they've gotten the definition of harassment badly wrong. They said you got it badly wrong. Then we both agree that somebody's gotten it badly wrong. Well, they just – she just stood up there and said, you know, you made a novel argument about what harassment means. Why don't you show – I mean, it's in the text of the regulations. It's the law. The law says it. No, but show us in the opinion. Where in the opinion is a harassment defined in the biological opinion? Well, I don't know – Take us to the record. Let's just see what – First of all, the agency is entitled to rely on lawfully promulgated regulations, Your Honor. But listen, the biological – listen. The biological opinion is supposed to tell us what the agency has decided in terms of the incidental take. And in determining the incidental take, they have to – they have to use the language that's in the regulation. So tell us in the biological opinion where the regulation was cited and how it was defined. I don't have that information at my fingertips. I don't know that they quoted – they don't necessarily quote all of the law verbatim back into the biological opinion. Those are usually pretty long, and they have a lot of the regulations quoted in them generally, especially for a pivotal issue like that. I don't think anybody perceives it as a pivotal issue. I do. Well, with respect, Your Honor, the interpretation of harassment that they're offering here today is an entirely novel one. It is not the services. It is not the regulations. It's not the law. So in the biological opinion at the end, it talks about conclusions, and then it has polar bears, incidental take statement. It has it at number 9. And it says incidental take is defined as take that is incidental to and not the purpose of the carrying out of an otherwise lawful activity. Now, it doesn't say anything there about immediate harm. Oh, I'm sorry. Here is the quote you were looking for, Your Honor. It's 1 Excerpts of Record 92. Harass is defined by the service as intentional or negligent actions that create the likelihood to listed species to such an extent as to significantly – the likelihood of injury – likelihood of injury as to significantly disrupt normal behavior patterns. So it's quoted there. Is that consistent with the definition of – It's identical to the lawfully – Okay. One question. She says you added another element, that the harm has to be immediate. No, I don't – we haven't argued that the harm has to be immediate. It has to be likely to cause injury. And if I read your brief again, that's what I'm going to see? Yes. Okay. We use the word immediate. I don't remember using that word, but I don't – She just stood up there and said that – I don't remember saying that at all. Look, here's the point, Your Honor. If a polar bear wanders near the project and hears a truck go by and then wanders the other way, they say that's ESA take. It's not. It's not ESA take. The bear is not likely to be injured. So you're – so it requires injury. You're saying it requires – It requires injury. Disruption isn't enough? Right. Well, it has to be likely to result in injury. I mean, there could be a disruption so significant that it's likely to result in injury. And that's what all these – I mean, they said that – I've run way over my time. I'm cutting into Mr. Brant and Erickson's time. But I do feel I have to address – I mean, this Court's decision – Possibly an argument, Mr. Stevens. This Court's decision in Palila does not address what harassment means. It interprets what harm means. This Court in Palila said – cited the congressional record to say that birdwatching could somehow be harassment. What it says is that it's – birdwatching is harassment if it's so invasive that it prevents the birds from hatching or raising their young. In other words, if there's injury. This idea that there's a longstanding interpretation that it doesn't involve injury is not correct. And you can see that. Let me just refer you – I recall the plaintiff's talking about, you know, denning. Right. Disruption to denning and the effect that that has. Right. So, I mean, the most likely way in which a bear could be injured is that they come in and they den near the project, and then construction starts. And they get disturbed by the noise. And then they abandon the den and maybe abandon their young. Right. And you could have a death or injury. It could vary the negative effect. Yes, absolutely. And that would be ESA take. And the service analyzed that issue. And it said that it's not – it's conceivable. It's possible. But there's mixed data on this. Sometimes the bears tolerate noise. They don't generally den if there's noise in the area. And so, while it's conceivable, it's not likely to result in injury here. I mean, again, we have to interpret this in the context. We have an overarching biological opinion that looks at the entire effects of – the entire industry in this area, including the Liberty Project, and says there's going to be no Endangered Species Act take. There's going to be some disturbances. And none of it rises to the level of take. You said you had five points you wanted to make. Did you hit all five? I didn't come close, Your Honor, but obviously I've run out of time, so I'm willing to do that. Well, I'm going to give your additional counsel a few minutes to argue. Five minutes. Thank you, Your Honor. Sven Brand-Erikson, may it please the Court, here for intervener at Hillcorp USA – Hillcorp, Alaska, I'm sorry. And here with me in the courtroom is the general counsel for the company to observe the argument. I want to hit on just a few NEPA points before going to the ESA issues. I think counsel covered the NEPA argument fairly well, but I want to point out as to the alternatives that petitioners have suggested that the Court require the agency to consider. One was offered is that the agency say that just look at gross emissions, that if the no-action alternative occurs, there will be no greenhouse gas emissions. That has the same flaw the courts have found with a perfect substitution analysis. It assumes that there will be no energy consumed if this project doesn't occur. The other alternative they suggest is assuming that half of the oil would not be consumed. If you reduce production by a barrel, that that will reduce consumption by half a barrel, and they have a model they point to that they suggest that. And the problem with that is it ignores the intermediary effect of price, that change in production does not directly result in a change in demand and production or consumption. There's a price intermediary. And the effect of the price intermediary is basically the piece that's hard to calculate, particularly at this level. And if you look at this specific issue, Bohm considered the potential impact on foreign markets and concluded it would be negligible because liberty is too small to have more than a negligible impact on price. And that's at 3ER466. So the agency's obligation under NEPA is to take a reasonably thorough, present a reasonably thorough discussion of the significant aspects of the probable environmental consequences. The agency did that with its analysis of the no-action alternative, and it provided a very thorough and a rational approach to this issue, and it met its obligation. Turning to the ESA issues, key consideration here, and really ignored by the petitioners, is the interlocking nature of the ESA and MMPA here. Yes, the MMPA has more stringent standards, more protective standards, but ESA Section 7 still applies at each step of the process. There actually are three ESA Section 7 consultations that occur in the context of this decision. One already occurred in 2016, which was the consultation on the incidental take rules, which will provide the basis for the subsequent letter of authorization that's for the specific project. That's the second action, second ESA action, which will happen in the future,  and the third, which occurs in the middle, is this review of Boehm's decision. The impact of Boehm's decision on polar bears has to be reviewed under ESA Section 7, but as has been explained in detail, the service can't authorize the take. It has to consider whether there will be jeopardy, which is the first threshold issue for the ESA. Is the action going to jeopardize the species or adversely modify its critical habitat? That decision, the only criticism of that decision here, is whether they relied on mitigation measures that are not certain to occur. Those mitigation measures are spelled out in the incidental take regulations. It's the same mitigation measures that have been used for a number of years. They're very well understood, and if the letter of authorization departs from it, it has to explain it, and if it's material, it would have to explain why the ESA— What are those mitigation measures? So it's—there's basically—there's a interaction plan that's required. It's basically project-specific interaction plan has to be developed and implemented. It's—there are criteria for when you implement physical harassment using a bean gun or otherwise, and what you also— You mean you chase the bear away? Yeah. Also, what you have to do to look for dens when you're doing construction work, which I would point out is only relevant for two years. What is the mitigation measure for that? For— Looking for dens. For looking for dens, it's doing surveys. I mean, you don't just go around and— It's doing surveys. The ITR mitigation measures are spelled out at SER 104 to 110, but basically you do a survey method to determine, and if they are found, then changes in the operations are required. Are there certain survey methods that are sanctioned? There are survey methods that have been used, the radar system that's discussed in the supplemental materials. Also, you can use dogs. It says that you're going to do it with guidance issued under MMPA incidental take regs. Yes. Do those exist? Yes. Those regs were adopted. The current version of those regs was adopted in 2016. Those are for the Beaufort area. And those apply to the letter of authorization. That's basically the global authorization for—it's a two-step process under the MMPA. But for your project, there has to be specific— A specific plan that matches those requirements. A specific project in the local area. So what happens is the company has to submit a plan that responds to the requirements in those regulations, and the agency has to form a determination that it meets those requirements. Has that happened yet? No, it hasn't because we don't have all the permits we need to do this project. So in addition to this, there are other— What permits do you need before you can do that? We still need an oil spill approval from BSEE, and there are some other approvals that are required. And until those permits are in place, letters of authorization are issued annually. And so it makes no sense to seek the letter of authorization for, you know, basically until it's clear that the project's ready to move forward. So let me ask you this. So when BOEM does—is that how you say it? BOEM? Yes. BOEM does the regulations for the MMPA. Yes. Actually, the service does. The service does, whoever does it. Those regulations have to be based on what? Because it's relating to the authorization for your project. Is that right? So there's a two-step process. There's an incidental take rule. There's an application by the industry seeking a five-year rule, and actually that process is starting now for the next iteration of the rule. Those rules have been issued pretty much continuously since 1993 for five-year periods. A range of activities are described in the application for the rule. The agency then evaluates that range of activities. Here it's oil and gas activities occurring in the general basin of the Beaufort Sea area. They evaluate what the collective impact of oil and gas activity in the whole area is likely to be. They then, having adopted a rule related to that, evaluated that under the ESA. Then for individual activities, they come forward, the companies come forward and request a letter of authorization for each year's activity under those rules. I would point the court to, in the supplemental excerpts of record, is the biological opinion for the incidental take rules? I would point you to two things, and this is really, I think, very important to the points you're discussing. At SER 136 to 138 are key parts of the excerpts. At 137 and 138 is a discussion of the administration of the biological opinion that explains how the letter of authorization interacts with the incidental take rules. Also, at 136, it is a discussion of the level of take expected under the incidental take rules for the entire five-year period. The key point that is the problem with their challenge to this is that for BOEMs, for the decision to approve BOEMs action here, the agency cannot legally, the service cannot legally authorize take because it has to wait until the MMPA authorization occurs, and that will occur consistent with this biological opinion, which already exists, or as explained at 137, how they have to do further ESA analysis if the circumstances have changed and have triggered further analysis. And then a really key point, it says at 138, each LOA, the letter of authorization that's ultimately issued, itself serves as an incidental take statement. And so there is a further ESA process that will occur producing a further incidental take statement that is specific to the project and that follows on and builds on the analysis for BOEM, as well as the incidental take rule analysis. Okay. Okay. Thank you. Thank you. Four minutes. Thank you, Your Honors. Regarding the NEPA climate change analysis, I heard from respondents this sort of theme that it's a small project and it's hard to assess the effects on the foreign market of this amount of fossil fuel. And I think it's important to remember that when we're looking at climate change, the circuit has recognized that climate change is a global problem. Any particular project is going to be small compared to the global emissions of greenhouse gases, but that's why it's important to look at each project. This court has said the impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct. Any given rule might have an individually minor effect on the environment, but these rules are collectively significant actions taking place over a period of time. So the collective effects on the foreign market are significant, and if the agency repeatedly ignores those effects, then that's a significant effect over time. Regarding the Endangered Species Act arguments, the 40-year rule that explains the relationship between the Marine Mammal Protection Act and the Endangered Species Act specifically says that an endangered – that Marine Mammal Protection Act authorization is more protective if – or at least as protective if the scope and duration of the MMPA authorization is the same as the scope and duration of the action that they're authorizing. So what they're thinking of is sort of cases where the MMPA authorization is a five-year authorization and the ESA assessment of it is just for that five-year authorization. Here the scope and duration are completely different. The Liberty Project is a 25-year project, and the MMPA authorization is only five years. Regarding the definition of harassment, the service – the 40-year rule itself for polar bears describes harassment as behavioral disturbance. It describes harassment by noise and lights. It's not consistent with the definition of harassment the council is putting forward here. And it's worth looking at – the National Marine Fisheries Service also did a biological opinion and incidental take statement for the Liberty Project. And there, the National Marine Fisheries Service did look at takes by harassment and harm over the life of the Liberty Project, and it estimated – it had numerical estimates for harassment and what kind of harassment it was. So let me just – the argument we just heard a minute ago, talking about the regulations that already exist for the Buford area. So what's your response to that? The regulation – there are regulations in place that will expire in 2021. This biological opinion doesn't specifically rely on those regulations because they may not necessarily be in place at the time that Liberty is authorized. And again, they only speak to – the mitigation measures that are under those current authorizations only speak to the requirements under the Marine Mammal Protection Act. They don't speak to whether the project will jeopardize the continued existence of the species over its 25-year life and in conjunction with everything else. I see. Anything else? No, if you have no further questions. No further questions? Nothing else? Thank you. Thank you, council. Thank you, council. We appreciate your arguments. The matter is submitted at this time. Anything else? No, that's it. Thank you. Thank you. Thank you.
judges: Paez, Rawlinson, Kobayashi